1  JOHNSON BOTTINI, LLP
    Francis A. Bottini, Jr, Esq. (SBN: 175783)
2      frankb@johnsonbottini.com
    Shawn E. Fields (SBN: 255267)
3      shawnf@johnsonbottini.com
501 West Broadway, Suite 1720
4  San Diego, California 92101
Tel:  (619) 230-0063
5  Fax:  (619) 238-0622

6  CHAPIN FITZGERALD SULLIVAN LLP
    Edward D. Chapin, Esq. (SBN: 053287)
7      echapin@cfslawfirm.com
    Douglas J. Brown, Esq. (SBN: 248673)
8      dbrown@cfslawfirm.com
550 West "C" Street, Suite 2000
9  San Diego, California 92101
Tel:  (619) 241-4810
10  Fax:  (619) 955-5318

11  *Attorneys for Plaintiffs-Relators*

12

13  **UNITED STATES DISTRICT COURT**

14  **SOUTHERN DISTRICT OF CALIFORNIA**

15  **United States of America** *ex rel.*
Ryan Ferguson and Mark T. Pacheco,
16  as *relators under the False Claims
Act,*
17                 Plaintiffs-Relators,
18      vs.
19
20  **Bridgepoint Education, Inc.;**
Ashford University; University of the
Rockies; and Does 1 through 20,
21             Defendants.

Case No.: '11 CV 0 4 9 3    BTM —MMA-POR

**False Claims Act Complaint for:**

1. Knowing False Statement,
    31 U.S.C. § 3729(a)(1)
2. Knowing False Records,
    31 U.S.C. § 3729(a)(2)

**Jury Trial Demanded**

*Filed Under Seal Pursuant to the False
Claims Act, 31 U.S.C. § 3730(b)*

22

23

24

25

26

27

28

1.     Plaintiffs-Relators Ryan Ferguson and Mark T. Pacheco (collectively, "Relators") bring this action to recover damages and civil penalties on behalf of the United States of America against Bridgepoint Education, Inc. ("Bridgepoint" or the "Company") and its two subsidiaries, Ashford University ("Ashford") and University of the Rockies ("The Rockies"), for violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "FCA").  Bridgepoint, Ashford, and The Rockies are liable under the FCA because they sought and obtained hundreds of millions of dollars of federally-guaranteed student loan proceeds from the United States, between March 10, 2005 and the present (the "Relevant Period"), under Title IV of the Higher Education Act of 1965 (the "HEA" or "Title IV").  As demonstrated below, Bridgepoint's, Ashford's, and The Rockies' liability arises from their false statements and certifications made to the United States Department of Education (the "DOE") in June 2005, September 2007, and periodically during the Relevant Period, for the purposes of obtaining and maintaining their eligibility to receive Title IV funding.

## I.     SUMMARY OF THE ACTION

2.     Bridgepoint is a for-profit higher education company headquartered in San Diego, California.  Through Ashford and The Rockies, Bridgepoint offers online programs for associate, bachelor's, master's and doctoral degrees. Bridgepoint's central purpose is not education, but profit.  To maximize its profit, Bridgepoint exploits the Title IV student loan programs and defrauds the United States.

3.     Bridgepoint generates the bulk of its revenues from Title IV programs.  In 2010, for example, Ashford and The Rockies derived 85% and 85.9% of their respective revenues from Title IV funds.  During the Relevant Period, Bridgepoint's revenue grew from $28,619,000 in 2006 to $713,233,000 in 2010.

4.     Bridgepoint accomplished this stunning revenue growth in two well-orchestrated phases that led to presenting false claims to the United States.

5.     First, Bridgepoint acquired Ashford and The Rockies in 2005 and 2007, respectively, and converted them from non-profit to *for-profit* entities. Upon conversion, Bridgepoint caused Ashford and The Rockies to make false statements to the DOE for the purpose of establishing their eligibility to enter into program participation agreements ("PPAs"), under which Ashford and The Rockies received financial aid funding from the DOE.  These false statements included promises that Bridgepoint, Ashford, and The Rockies complied and would continue to comply with Title IV and its attendant regulations, including 20 U.S.C. § 1094.  These statements were false because, as demonstrated below, Bridgepoint, Ashford, and The Rockies did not, and never intended to, comply with Title IV's mandates, including:

- § 1094(a)(8)'s requirement to provide prospective students with "data concerning employment statistics, graduation statistics, and any other information necessary to substantiate the truthfulness of the advertisements"; and

- § 1094(a)(20)'s prohibition against incentive compensation to enrollment advisors based on the number of students they enroll.

6.     Second, while making the false promises to the DOE regarding their compliance with Title IV, Bridgepoint, Ashford, and The Rockies designed and implemented tactics in direct violation of Title IV, for the sole purpose of recruiting students and inducing those students to apply for federal student loans. Throughout the Relevant Period, Bridgepoint, Ashford, and The Rockies implemented these illegal and fraudulent tactics, but periodically and falsely certified, and continue to certify to the DOE that they comply with Title IV. These false certifications enabled Bridgepoint, Ashford, and The Rockies to

False Claims Act Complaint
(United States ex rel. Ferguson & Pacheco v. Bridgepoint Educ. Inc. et al.)

continuously generate over 85% of their multi-million dollar revenues from Title IV funds.

7.    While being employed as enrollment advisors at Ashford during the Relevant Period, Relators witnessed Bridgepoint's uniform illegal recruitment tactics, including:

- Hiding required disclosure information from prospective students in violation of Title IV;

- Misrepresenting the true cost of attendance at its universities;

- Misrepresenting the quality of academic instruction;

- Misrepresenting students' post-graduation employability and earnings potential; and

- Misrepresenting students' obligation to repay federally subsidized student loans.

8.    Bridgepoint spends up to 30% of its operating budget on recruiting students. This amounts to approximately $2,714 per student. In contrast, Bridgepoint only spends $700 per student on instruction. Bridgepoint also engages in "incredibly intense" lobbying in Washington, D.C. in an attempt to avoid or mitigate legislation intended to curtail its wrongful conduct.

9.    Bridgepoint's illegal tactics manifest themselves through its enrollment of under-qualified students, its low graduation rate, and those students' low post-graduation job prospects. Not surprisingly, a startling number of Bridgepoint students default on their federally guaranteed student loans. Whereas the average cohort default rate (the percentage of students who default on their students loans) nationwide was approximately 7.0% in 2008, Ashford reported a cohort default rate of 13.3% in 2008. That number increased to 15.3% in 2009. In spite of this default rate, Bridgepoint continues to generate enormous profits because the hundreds of millions of dollars in Title IV funding it receives

annually are fully guaranteed by the United States, and by extension, the American taxpayers.

10.    For this reason, Bridgepoint, Ashford, and The Rockies continue to pressure their employees – through both illegal incentive compensation and threats of termination – to engage in unlawful recruitment tactics in violation of Title IV.  Specifically, Bridgepoint employs a compensation structure under which the enrollment advisors are evaluated – and paid – *solely* based on the number of students they enroll.  This structure, as demonstrated below, falls outside the "safe harbor" provided in 34 C.F.R. § 668.14(b)(22)(ii)(A).

11.    Because Bridgepoint, Ashford, and The Rockies knowingly violated Title IV and its attendant regulations, their statements of compliance – made in their initial certifications with the DOE and subsequent, periodic certifications and reports – were false.

12.    Despite these false statements, during the Relevant Period, Bridgepoint, Ashford, and/or The Rockies knowingly presented or caused to be presented to the DOE claims for payment or approval.  Because these claims are false within the meaning of the FCA, Bridgepoint, Ashford, and The Rockies damaged the treasury of the United States by causing the United States to pay out money it was not obligated to pay.  This action seeks to recover damages and penalties on behalf of the United States that resulted from such payments.

## II.    APPLICABLE LAW

### A.    Defendants' Obligations Under Title IV

13.    When an educational institution wishes to receive federal student loan funding under Title IV and the HEA, it must enter into a PPA with the DOE, in which it agrees to abide by a panoply of statutory, regulatory, and contractual requirements.

14.    One of these requirements, for example, is a prohibition under 20 U.S.C. § 1094(a)(20) from "provid[ing] any commission, bonus, or other

-4-

incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities." This prohibition was enacted based on evidence of serious program abuses and was designed to curb the risk that recruiters would sign up poorly qualified students who would derive little benefit from the subsidy and might be unable or unwilling to repay federally guaranteed student loans. *See* S. Rep. No. 102-58, at 8 (1991).

15.     In addition, an educational institution receiving federal student loan funding must periodically file certifications with the DOE affirming its compliance with Title IV and its attendant regulations.

16.     Accordingly, Bridgepoint, Ashford, and The Rockies are obligated to comply with Title IV and its attendant regulations and to periodically certify their compliance to the DOE.

**B.     Defendants' Liability Under the FCA**

17.     Congress enacted the FCA in 1863 and amended it in 1986 by the False Claims Amendments Act, Pub. L. 99-562, 100 Stat. 3153. Congress enacted the 1986 amendments to enhance and modernize the tools for the United States to recover losses sustained by the frauds against it. The amendments were intended to create incentives for individuals with knowledge of frauds on the United States to disclose the information without fear of reprisals or inaction, and to encourage the private bar to commit resources to prosecuting fraud on the behalf of the United States.

18.     The FCA provides that any person who presents, or causes to be presented, false or fraudulent claims for payment or approval to the United States, or knowingly makes, uses, or causes to be made or used false records and statements to induce the United States to pay or approve false and fraudulent claims, is liable for a civil penalty ranging from $5,000 up to $10,000 for each claim, plus three times the amount of the damages sustained by the United States.

19.    Here, Defendants violated the FCA by (a) making the false promise to the DOE regarding defendants' compliance and intention to comply with Title IV and its attendant regulations (*i.e.*, "promissory fraud"); and (b) periodically making false certifications to the DOE regarding defendants' compliance with Title IV and its attendant regulations (*i.e.*, "false certification").

20.    The FCA also allows any person having information about false or fraudulent claims to bring an action for himself and the United States, and to share in any recovery. The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on defendant(s) during that time).

21.    Based on these provisions, Relators seek to recover all available damages, civil penalties, and other relief for the violations alleged below.

22.    While the precise amount of the loss to the United States cannot presently be determined, it is estimated that the damages and civil penalties that may be assessed against defendants in this action amount to millions of dollars.

## III.    JURISDICTION AND VENUE

23.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and 31 U.S.C. § 3732. The action involves a federal question because it seeks recovery due to Defendants' wrongful conduct in obtaining funds from the DOE under Title IV.

24.    The Court has personal jurisdiction over defendants because 31 U.S.C. § 3732(a) authorizes nationwide service of process and because defendants reside and/or transact business in this District.

25.    Venue is proper under 31 U.S.C. § 3732(a) because Bridgepoint is headquartered in this District, a substantial portion of the misconduct underlying this complaint occurred here, Bridgepoint has received substantial compensation in this District by doing business here, and its activities has an effect in this District. The conduct proscribed by § 3729 also occurred in this District.

## IV.   THE PARTIES

### A.   Plaintiffs

26.   Plaintiff-Relator Ryan Ferguson was employed at Ashford as an enrollment advisor between August 2009 and January 2011.  During his tenure at Ashford, Mr. Ferguson was pressured to (a) meet unreasonable enrollment quotas; (b) enroll students who lacked the qualifications and determination to enroll; and (c) make false and misleading statements to prospective students regarding their enrollment, financial aid, and job prospects.   Mr. Ferguson brings this action on behalf of the United States.

27.   Plaintiff-Relator Mark T. Pacheco was also an enrollment advisor at Ashford from August 2009 until December 2010.  During his employment, Ashford pressured Mr. Pacheco to (a) make false and misleading statements to prospective students regarding their enrollment, financial aid, and job prospects; (b) meet unreasonable enrollment quotas; and (c) enroll students who lacked the qualifications and determination to enroll.   Mr. Pacheco brings this action on behalf of the United States.

28.   The United States of America is named as a plaintiff because, as a result of the false claims alleged in this complaint, the defendants were awarded federal funds under Title IV.

### B.   Defendants

29.   Defendant Bridgepoint Education, Inc., founded in 2004, is a Delaware corporation with its company headquarters located at 13500 Evening Creek Drive North, Suite 600, San Diego, California 92128.  Bridgepoint purchased The Franciscan University of the Prairies, then a non-profit campus-only college in Iowa, in March 2005, renamed it Ashford University, and converted it into a for-profit online institution.  On September 11, 2007, Bridgepoint purchased the non-profit campus-only Colorado School of

Professional Psychology, renamed it University of The Rockies, and converted it into a for-profit online institution. Bridgepoint hires all employees for both academic institutions and maintains small campuses in Clinton, Iowa (Ashford) and Colorado Springs, Colorado (The Rockies). Bridgepoint conducted an initial public offering on April 14, 2009 and is currently one of the largest publicly-traded for-profit college companies in the United States.

30. Defendant Ashford University is an academic entity founded by Bridgepoint in 2005 to run the college formerly known as The Franciscan University of the Prairies, founded in 1918. Ashford maintains a small campus in Clinton, Iowa, but 99% of the institution's students are currently enrolled only in an "online" capacity.

31. Defendant University of The Rockies is an academic entity founded by Bridgepoint in 2007 to run the college formerly known as Colorado School of Professional Psychology. The Rockies maintains a small campus in Colorado Springs, Colorado, but 99% of the institution's students are currently enrolled only in an "online" capacity.

32. The true names and capacities of defendants identified as Does 1 through 20, inclusive, are presently not known to Relators, who therefore sue these defendants by such fictitious names. Relators will seek to amend this complaint pursuant to Federal Rule of Civil Procedure 15 and include these Doe defendants' true names and capacities when they are ascertained. Each of the fictitiously named defendants is responsible in some manner for the conduct alleged herein and for the injuries suffered by the United States as a result of defendants' illegal conduct.

///

///

///

///

## V.    FACTUAL ALLEGATIONS

### A.    Defendants Achieve Extraordinary Growth Through Illegal Practices

33.    Through its two for-profit subsidiaries, Ashford and The Rockies, Bridgepoint offers approximately 1,200 courses and 70 degree programs with 130 concentrations and specializations.  As of December 31, 2009, Bridgepoint had more than 5,800 employees.  As of September 30, 2010, Bridgepoint had 77,179 students.  Ninety-nine percent of these students were attending classes exclusively online.

34.    Since the beginning of the Relevant Period, Bridgepoint has experienced unprecedented student enrollment.  Total student enrollment at Ashford and The Rockies increased 115.4% to 42,025 students on March 31, 2009, compared with 19,509 students at the end of the first quarter of 2008.  New student enrollment for the first quarter of 2009 at both of Bridgepoint's academic institutions was approximately 16,800, an increase of 90.9%, compared with new enrollments of approximately 8,800 for the first quarter of 2008.

35.    The growth in enrollment also caused significant growth in revenue from $28,619 in 2006 to $713,233,000 in 2010.  Bridgepoint's revenue figures between 2006 and 2010 are listed below:

|         | 2006 | 2007 | 2008 | 2009 | 2010 |
|---------|------|------|------|------|------|
| Revenue | $28,619,000 | $85,709,000 | $218,290,000 | $454,324,000 | $713,233,000 |

36.    Bridgepoint's growth is no accident.  Bridgepoint's management orchestrated this extraordinary growth by taking two steps.  First, Bridgepoint acquired Ashford's predecessor in March 2005 and The Rockies in 2007, and converted both institutions from non-profit to *for-profit* educational institutions.  Second, Bridgepoint designed and implemented illegal and fraudulent recruitment tactics, as set forth below, aimed at recruiting as many students and

obtaining as much federal financial aid through these students as possible, without regard to the students' needs or Title IV's prohibitions.

37.    To demonstrate Bridgepoint's primary focus on enrolling students, rather than educating them, one need only consider the fact that Bridgepoint spends 30% of its budget on recruitment.  This amounts to $2,714 per student.  In stark contrast, Bridgepoint only spends $700 per student on instruction. Bridgepoint also reserves a generous portion of its budget on lobbying Congress in an attempt to avoid being held accountable for its wrongdoing.

38.    Bridgepoint, Ashford, and The Rockies employ deceptive marketing tactics designed to entice prospective students to enroll at its universities and apply for federal loans they do not need and cannot pay back.  In particular, Bridgepoint, Ashford, and The Rockies (a) improperly hide information from prospective students on its Web sites; and (b) mislead students, either through affirmative misrepresentations or material omissions, regarding the true cost of attending their universities, the quality of academic instruction they provide, their students' post-graduation employability, and their students' need for federal student loans and obligation to repay them.  These deceptive tactics are designed to maximize Bridgepoint's profits at the expense of its students, the federal government, and the American taxpayer.

**B.    Defendants Made False Promises and Certifications to the DOE to Establish and to Maintain Their Eligibility to Receive Title IV Funding**

**(1)    Initial False Promises and Certifications**

39.    While Bridgepoint designed and implemented the illegal recruitment tactics, Bridgepoint caused Ashford and The Rockies to procure PPAs from the DOE.

40.    To apply for a PPA with the DOE, Bridgepoint, Ashford, and/or The Rockies certified and promised that they complied with, and intended to continue to comply with, Title IV and its attendant regulations.

-10-

41.   Bridgepoint, Ashford, and The Rockies knew that these certifications and promises were false when made because Bridgepoint, Ashford, and The Rockies were implementing the illegal recruitment tactics, which, by design, violated Title IV.

42.   Based on these false certifications and promises, the DOE issued Ashford's PPA in June 2005 following Bridgepoint's acquisition of Ashford. Given the change of ownership, the DOE placed Ashford on a provisional certification status for three years, but removed this provisional status in 2008. Ashford's most recent PPA is set to expire on June 30, 2011.

43.   Similarly, based on the false certifications and promises, the DOE issued The Rockies' PPA in September 2007 following its acquisition by Bridgepoint. The Rockies also was placed on provisional certification status for three years, ending on September 30, 2010. At that time, The Rockies was placed on permanent certification status. The Rockies' current PPA is set to expire on September 30, 2013.

### (2)   Periodic False Certifications and Reports

44.   Both Ashford's and The Rockies' PPAs clearly state on the first page that "the execution of this Agreement by the Institution and the Secretary is a prerequisite to the Institution's initial or continued participation in any Title IV, HEA program.

45.   The PPA also sets forth Bridgepoint's requirements to remain in compliance and to continue to receive Title IV funds. By executing the agreement, Bridgepoint promised to comply with the terms and conditions of the PPAs. In particular, the PPAs set forth the following conditions for Ashford and The Rockies:

- The institutions must comply with all statutory provisions of Title IV;

- If advertising job placement and/or graduations rates, the institutions must make available to prospective students the most recent accurate data available concerning employment statistics, graduation statistics, and any other information necessary to substantiate the truthfulness of the advertisements;

- The institutions must not provide, nor contract with any entity that provides, any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities; and

- If the schools' stated objectives of a given education program are to prepare a student for gainful employment in a recognized occupation, the schools must demonstrate a reasonable relationship between the length of the program and entry level requirements for the recognized occupation for which the program prepares the student.

46.     Title IV requires that Bridgepoint, Ashford, and/or The Rockies periodically file with the DOE certifications affirming their compliance with all requirements under Title IV and its attendant regulations.

47.     Bridgepoint, Ashford, and/or The Rockies, at least annually during the Relevant Period, filed with the DOE certifications and reports affirming their compliance with Title IV and its attendant regulations.

48.     These certifications and reports are false because Bridgepoint, Ashford, and The Rockies knew that their illegal recruitment tactics violate Title IV and its attendant regulations.

**C.     Defendants Implement the Illegal Recruitment Tactics in Violation of Title IV and Its Attendant Regulations**

**(1)     The Defendants Hide Information on Their Web Sites**

49.     Federal law requires educational institutions receiving Title IV funds from the federal government to "make certain information readily available

-12-

to enrolled and prospective students.  Institutions may satisfy their disclosure requirements by posting the information on their Internet Web sites.  Information to be provided includes: tuition, fees, and other estimated costs; the institution's refund policy; the requirements and procedures for withdrawing from the institution; a summary of the requirements for the return of Title IV grant or loan assistance funds; the institution's accreditation information; and the institution's completion or graduation rate."  Title IV requires academic institutions to make this information readily available to prospective students *before they enroll in any program.*

50.     Defendants have made false claims to the United States because they repeatedly promised to comply and represented during the Relevant Period that they complied with these requirements.  Defendants knew that they were not in compliance and, moreover, engaged in promissory fraud because they had no intention at the time they made those promises to comply with Title IV's requirements.

51.     Prospective students obtain information about the schools primarily by accessing the schools' Web sites.  Since students at both schools take classes exclusively online, all students must be computer literate and be able to access the schools' Web sites using the computer.  But Ashford and The Rockies employ a sophisticated – and misleading – tactic in displaying information on their Web sites.  In both cases, when prospective students enter the search terms "Ashford University" or "University of the Rockies" into an Internet search engine, the first several search results direct individuals to a polished-looking yet basic site that offers vague and misleading praise for the universities and an option to enroll online.  Attempts to find specific information on either site – including the information required by the federal disclosure law – lead only to an option to complete an online enrollment form, in violation of federal and California law.  While a more comprehensive Web site for both schools exists,

prospective students cannot easily access them without previously knowing the exact Web addresses.

### (2)   Defendants Misrepresent the True Cost of Attending Their Schools

52.   Defendants falsely promised to comply and falsely certified that they complied with the requirements under 20 U.S.C. § 1094(a)(20) and the terms of the PPAs to disclose to students any "information necessary to substantiate the truthfulness of [their] advertisements."

53.   But Defendants uniformly misrepresent to all potential students the true cost of attending Ashford and The Rockies.  In particular, Defendants misrepresent to potential students that Ashford and The Rockies offer some of the lowest-tuition, most affordable degree programs available when in fact they offer among the highest cost, least affordable degree programs available.

54.   For example, Ashford's Web site claims that the school represents "higher education made affordable . . . You deserve a quality education at an affordable price . . . You'll find Ashford University, founded in 1918, is an ideal choice for you as a working adult or someone with an uncompleted degree because Ashford is affordable: *benefit from one of the lowest program costs*."  The Web site's "Military Benefits" page also claims that Ashford "*offers one of the lowest tuition costs available*" without specifying anywhere on its enrollment site the actual cost of attendance.

55.   In reality, however, Ashford's undergraduate tuition rates are among the highest in the country at $372 per credit hour.  The U.S. Department of Veterans Affairs (the "VA") publishes an annual table listing the state-by-state rates for "the *highest* in-state, undergraduate, public tuition" in each state in the country.  In determining which schools are the most expensive, the VA explains that "all undergraduate program costs were taken into consideration to determine the highest in-state maximum tuition per credit hour and the maximum fees per

term.  These figures may include program tuition for high cost programs such as flight courses taken as part of a degree requirement or undergraduate pharmacy, nursing and engineering degrees."  In other words, the VA's table lists the costs to attend *the very most expensive public colleges* in each state and territory in the country.  In the last updated table, published August 30, 2010, a full 28 states' *most expensive public colleges* charged less than $372 per credit hour.  Put simply, Ashford – which claims to offer students "one of the lowest tuition costs available" – *charges more tuition per credit hour than all of the public colleges and universities in over half of the states in the entire nation.*

56.    In fact, for students in many states (and some U.S. territories) Ashford's tuition rates are more than double the cost of the most expensive public school alternatives:

| State/Territory | Maximum In-State Tuition Rate | % Increase to Attend Ashford |
|---|---|---|
| Alaska | $170 | 219% |
| Arkansas | $210 | 177% |
| Montana | $205 | 181% |
| Nebraska | $251 | 148% |
| Nevada | $156 | 238% |
| New Mexico | $229 | 162% |
| Oklahoma | $188 | 200% |
| Puerto Rico | $90 | 413% |
| South Dakota | $99 | 376% |
| Utah | $238 | 156% |
| Virgin Islands | $125 | 298% |
| Wyoming | $99 | 376% |

57.    As the VA's table and the table above demonstrate, the claim that Ashford offers one of the most affordable college educations for students simply

-15-

is not true. The reality is that an Ashford student who completes his or her undergraduate degree with the bare minimum 120 credits will pay nearly $45,000 in tuition alone, not including the outrageous hidden fees described below.

58.   Tuition at the Rockies is even more expensive, at a whopping $682 per credit hour for the school's Master's program and $882 per credit hour for the doctorate degree. While The Rockies' higher cost is explained in part because it offers exclusively graduate degrees, the school's far higher than average tuition rates, coupled with the relative worthlessness of the degree for job placement purposes (as detailed below), still render Bridgepoint's statements about its institutions' "great value" false and misleading.

59.   In addition to the written misrepresentations regarding the value of a Bridgepoint education, prospective students are uniformly orally misled by Bridgepoint enrollment advisors, who mislead students regarding the true cost of attendance through scripted recitations provided by Bridgepoint.

60.   Bridgepoint's enrollment advisors misrepresent the total cost of attendance at Bridgepoint's schools by (a) quoting to prospective students tuition rates for a four-year degree program, while failing to disclose that the program requires five years' worth of student loans; and (b) quoting only the tuition rates during the enrollment process, while failing to disclose numerous hidden administrative fees. Only after enrolling and promising to pay for classes do students become aware of the following fees:

| Fee | Cost at Ashford | Cost at The Rockies |
|---|---|---|
| Technology Services Fee | $1,290 | $250 |
| Sponsored Professional Training Assessment (per credit hour) | $30 | N/A |
| Prior Learning Assessment Experiential Learning Essay Assessment (per course) | $125 | N/A |
| Books and Materials (per course) | $100 | $200 |
| Graduation Fee | $110 | $500 |
| Education Partnership Fee | $30 | N/A |

False Claims Act Complaint
(United States ex rel. Ferguson & Pacheco v. Bridgepoint Educ. Inc. et al.)

| Fee | Cost at Ashford | Cost at The Rockies |
|---|---|---|
| **TOTAL** (based on min. 120 credit hours for undergraduate degree at Ashford; 68 credit hours for doctoral degree at The Rockies) | $1,403 | $5,350 |

**(3)    Defendants Engaged in Promissory Fraud and False Certification by Misrepresenting the Quality and Reputation of Their Academic Programs, Their Job Placement Rates, and their Students' Post-Graduate Employability**

61.     Defendants falsely promised to comply and certified that they complied with the requirements under 20 U.S.C. § 1094(a)(20) and the terms of the PPAs to disclose to students "the most recent available data concerning employment statistics [and] graduation statistics."

62.     But Defendants make uniform written and scripted oral misrepresentations regarding the quality of its academic programs and the reputation these programs enjoy with potential employers.

63.     Both Ashford's and The Rockies's Web sites state the following in the "Frequently Asked Questions" section of their respective sites:

> How does my degree compare to degrees from other schools?
>
> Your degree from Ashford University/University of the Rockies is equally valuable, accepted, and honorable as any equivalent degree you could earn from another accredited school or university, whether on a traditional campus or online. *The only difference between a degree from Ashford University/University of the Rockies and a degree from another school is the money and time you'll save through Ashford University/University of the Rockies.*

64.     This statement is false and misleading in two ways. First, it misleadingly suggests to prospective students that degrees from one of Bridgepoint's academic institutions are somehow of "equal value" to other accredited schools or universities, presumably including the top schools in the country. Second, and more importantly, this statement misleadingly suggests that potential employers or other academic institutions that recognize degrees

-17-

from other accredited schools and universities will recognize degrees from Ashford or The Rockies as valid.  This is not the case, however.  A large number of universities will not accept any transfer credits from any online universities, nor will they recognize an undergraduate degree from an online university as satisfying the academic prerequisites for admission to a graduate or professional degree program.  Moreover, many employers specifically do not recognize degrees from online institutions as proof that a prospective employee qualifies for a certain position, whereas they will recognize an identical degree from a traditional campus as proof of qualification.

65.     The Rockies, for example, offers certificate programs as well as Master's and doctorate degrees in psychology.  In order to practice psychology in any state or with the military, one must possess both a relevant degree in psychology and a professional license of the jurisdiction within which the student wishes to practice.  However, none of the degree programs offered at The Rockies are recognized as relevant academic degrees, nor are they intended to prepare students for professional licensure.  In fact, while the school makes misrepresentations to the contrary as shown below, it simultaneously admits in the fine print of its program enrollment form that "this program is not intended to prepare students for professional licensure or certification in any field, regardless of concentration."  In other words, the school admits that its degrees do not prepare students for employment *in any field* while simultaneously claiming its degrees are "equally valuable" and "equally honored" as degrees from traditional universities.

66.     Notwithstanding the fact that Bridgepoint knows its degrees are worthless for anyone desiring to become a licensed psychologist, school President Charlita Shelton, on the home page of the school's Web site, misleadingly states that "*the University's goal is to provide a professional graduate education in psychology to individuals who seek licensure as*

-18-

*psychologists*." This statement is false and misleading because, by the school's own admission elsewhere, the programs are specifically not intended to prepare students for professional licensure.

67.     Bridgepoint's enrollment advisors likewise make uniform scripted oral misrepresentations about the quality and reputation of its schools. During training, Bridgepoint instructs all of its enrollment advisors to use its own internal sales lexicon so as to conceal the competitive sales environment Bridgepoint fosters and to avoid giving prospective students the impression that they are the recipients of a hard sales pitch. Through this training, enrollment advisors are taught never to use words like "sell," "sale," "closing," "commission," "producers," or "numbers." Instead, Bridgepoint instructs enrollment advisors to use words with positive connotations, such as "motivate," "service," and "start." For example, Bridgepoint trains its enrollment advisors not to ever describe what they do as "selling" anything, but rather that they are "servicing students."

68.     Pursuant to Bridgepoint's instruction, enrollment advisors describe Ashford and The Rockies as great schools with amazing professors who offer individualized attention to their students. Moreover, these advisors explain to prospective students, following uniform written scripts and instruction from Bridgepoint, *that a degree from Ashford or The Rockies will prepare them and qualify them for a number of professional occupations and provide them with a competitive advantage over graduates from other schools.*

69.     These statements are false and misleading because the quality of instruction at Ashford and The Rockies is uniformly subpar, the instructors are far less qualified than professors from comparable universities, and degrees from these schools actually place graduates at a competitive disadvantage given the fact that many employers refuse to even recognize the validity of the degrees.

70.     Bridgepoint enrollment advisors continue to make false and misleading statements about the quality and value of a Bridgepoint education, and about students' job placement prospects, during the student's period of enrollment.  In an effort to maintain a high "retention rate," advisors reassure students that the students are still receiving a quality education at an affordable price and that they should continue pursuing their degrees to completion.

71.     Bridgepoint's false and misleading written and oral statements detailed above are and were false and misleading for the additional reasons that they omit to disclose to students the following material facts:

    (a)    That Ashford and The Rockies charge among the highest tuition rates in the nation, higher than every public undergraduate institution in over half of the states in the country;

    (b)    That degrees from Ashford and The Rockies are not as marketable as similar degrees from traditional postsecondary schools;

    (c)    That degrees from Ashford and The Rockies are of only *de minimis* value to graduates seeking employment in their chosen professions; and

    (d)    That fewer than 5% of graduates from Ashford and The Rockies earn the salaries quoted to students as representative of their "earning potential" in certain professions.

### (4)     Defendants Employ Deceptive Tactics Regarding Federal Financial Aid

72.     As described above, the defendants have an incentive to induce prospective students to apply for the maximum dollar amount of federal loans possible because federal law allows them to accept up to 90% of their funding from Title IV programs; because Title IV loans are disbursed directly to schools; and because Title IV loans are fully guaranteed by the federal government and,

by extension, the American taxpayer.  Indeed, the defendants do employ uniform deceptive tactics to induce prospective students to apply for federal student loans that they may not need, may not be able to repay, and for which they would not have applied had they not been misled into applying for them.

73.   For example, pursuant to uniform written scripts and instructions provided to enrollment advisors during training, Bridgepoint, Ashford, and The Rockies employees pressure prospective students to enroll in a degree program before completing their financial aid applications.  After students' enrollment, the defendants complete and submit the financial aid applications on the students' behalf, requesting the maximum allowable amount even if that amount exceeds the cost of attendance at the university.  During this process, enrollment advisors fail to tell prospective students that the loans are disbursed directly to the school and not the individual.  This direct disbursement allows the defendants to demand payment immediately upon enrollment rather than allowing students to defer payment until after graduation.

74.   The defendants also *misleadingly downplay students' federal loan repayment obligations, often telling prospective students not to worry about loan repayment or telling students that they don't have to worry about repaying students loans or that the federally-mandated obligation to repay one's student loans "isn't that big a deal."*  Critically, they also do not disclose to prospective students that federally subsidized student loans are not dischargeable in bankruptcy.  By downplaying the seriousness of its students' student loan repayment obligations, Bridgepoint makes applying for federal loans more attractive to prospective students.  And because such loans are federally guaranteed, Bridgepoint profits whether its students default or not.

75.   These misleading tactics are incredibly harmful to students, who are tricked into applying for loans that they cannot pay back and which will remain obligations for the rest of their lives since federal student loans are not

dischargeable through bankruptcy.  Thus, the students who have defaulted on their loans (as high as 17.4% of students according to one government estimate) after being misled by Bridgepoint's deceptive tactics will continue to carry a poor credit rating – potentially for life – even if they file for bankruptcy and attempt to restore their financial health.  This fact is a far cry from the Bridgepoint misrepresentation that repaying federal loans "isn't that big a deal." These statements are also false and misleading because Bridgepoint failed and fails to disclose the following material facts to students:

(a)      That far from repayment of loans not being "that big a deal," students have an absolute obligation to repay student loans and risk being saddled with their loan debt for life because federal student loans are not dischargeable through bankruptcy;

(b)      That Ashford and The Rockies were not a "great value" but instead charged some of the highest tuition rates in the country;

(c)      That degrees from Ashford and The Rockies are not as marketable as similar degrees from traditional postsecondary schools, making it hard for their graduates to repay their student loans after graduation;

(d)      That degrees from Ashford and The Rockies are only of *de minimis* use to graduates seeking employment in their chosen profession, making it more difficult for graduates to repay their student loans after graduation;

(e)      That salaries quoted to students representing their "earning potential" in certain professions were earned by less than 5% of all individuals employed in those professions; and

(f)      That members of the U.S. military and military veterans drop out and default on student loans at a much higher rate at for-profit colleges like The Rockies and Ashford than at traditional non-profit colleges.

**(5)   Defendants' Compensation System Incentivizes Enrollment Advisors to Employ Illegal Tactics and Falls Outside the "Safe Harbor"**

76.   Institutions that participate in Title IV education programs, such as Bridgepoint, Ashford, and The Rockies, are prohibited from providing incentive payments to employees for securing student enrollment.

77.   Through a scheme designed to skirt this regulation, however, Bridgepoint incentivizes its enrollment advisors to aggressively recruit and secure student enrollment. Bridgepoint also fosters a competitive environment whereby enrollment advisors' success or failure is determined not by the accuracy or quality of advice they give to prospective students, but simply by the number of prospective students the advisor actually enrolls. As is inevitable under such a scheme, Bridgepoint's enrollment advisors provide false and misleading information to get students to enroll, and enroll prospective students even when it is obvious that such prospective students do not qualify or would not benefit from the program.

78.   Defendants' enrollment advisors work in large call centers and are divided into teams. The highest performing teams – as determined *solely* by number of students enrolled – win prizes and often receive substantial raises. Underperforming team members do not receive bonuses or pay raises, are singled out for probationary programs, and ultimately are fired for failure to enroll more students. This hypercompetitive atmosphere not only fosters a culture encouraging deceptive sales practices in the name of higher enrollment numbers, but also flatly violates federal law.

79.   Prior to January 2009, Bridgepoint did not disseminate any written guidelines to its enrollment advisors regarding how their compensation was determined. Bridgepoint compensated its enrollment advisors based *solely* on the number of students they enrolled, in violation of Title IV. Nonetheless, Bridgepoint continued to falsely represent to the DOE and other agencies and

representatives of the United States that it did not compensate its enrollment advisors based solely on the number of students they enrolled.

80.    Starting in January 2009, Defendants designed a fraudulent "matrix" system to purportedly evaluate enrollment advisors' performance. Although the matrix contains evaluation criteria regarding performance measures other than enrollment numbers, Bridgepoint managers have complete discretion in evaluating enrollment advisors' performance and they exercise their discretion solely based on the number of students the advisors enroll.

81.    The matrix system and other reports relating to compensation prepared by Bridgepoint, Ashford, and The Rockies and their consultants represent a mere pretext to create an appearance of compliance with the prohibition against incentive-based compensation to enrollment advisors. The matrix system is a fraud and is in fact not used by Bridgepoint to evaluate the compensation of its enrollment advisors. Instead, Bridgepoint determines its enrollment advisors' compensation *solely* based on the number of students they enroll. In essence, Bridgepoint has two sets of books: the first is the matrix system, which is a fraud designed solely to feign compliance with federal law's prohibition against incentive-based compensation; and the second contains only the numbers of students enrolled by the enrollment advisors – the *sole* basis on which Bridgepoint determines their compensation.

82.    In fact, Bridgepoint, Ashford, and The Rockies increase or decrease enrollment advisors' pay *solely* based on the number of students the advisors enroll, in violation of 20 U.S.C. § 1094(a)(20).

83.    As a result, the compensation structure designed and implemented by Bridgepoint, Ashford, and The Rockies falls outside the "safe harbor" provided in 34 C.F.R. § 668.14(b)(22)(ii)(A). Because all written materials prepared by Bridgepoint, Ashford, and The Rockies, including the matrix and consultant reports, are designed to create an appearance of compliance with the

prohibition against incentive compensation, Bridgepoint, Ashford, and The Rockies may not hide behind these fraudulent materials to avoid a finding of non-compliance.

### D. Defendants Pressured Enrollment Advisors to Illegally Recruit Students

#### (1)    Mr. Ferguson's Experience

84.    Throughout his tenure as an Enrollment Advisor at Ashford, Mr. Ferguson understood that his compensation was entirely based on the numbers of (1) student applications he turned in; and (2) students (he enrolled) who would remain enrolled for an initial period. Mr. Ferguson understood that the matrix system and other non-number-based evaluations were a mere pretext.

85.    Mr. Ferguson received several verbal and written warnings, on May 14, 2010, September 14, 2010, October 8, 2010, and December 11, 2010, that he was "performing at an unsatisfactory level" solely because he was not enrolling enough students.

86.    In each formal reprimand, Mr. Ferguson only received criticism for his inability to meet enrollment quotas – no mention of his ability to offer accurate information or give helpful advice or guidance to prospective students was ever mentioned. In fact, the action plan designed for Mr. Ferguson was focused only on enrolling a maximum number of students, including "focusing on the activities that will enroll students: outbound phone calls, appointment setting, and conducting interviews."

87.    For example, Mr. Ferguson was warned in writing that if he did not "turn in a minimum of 3 applications per week," "schedule a minimum of 2 appointments per day," and "conduct a minimum of 6 appointments/interviews per week," he would be terminated.

88.    These actions are improper and unlawful, as they require an enrollment advisor to submit a minimum number of applications regardless of his prospective students' desire to enroll or not.

89.    Mr. Ferguson also received direct pressure from multiple Bridgepoint/Ashford managers to increase his enrollment numbers.  John Piatek, an Ashford Enrollment Manager, warned Mr. Ferguson that he could receive a pay cut, and explained that "the pay cut is designed to demoralize some people [who do not meet their quotas], and they will not want to stay after being cut." Another Enrollment Manager, James Quance, sternly warned Mr. Ferguson that "applications save your seat, and retention gets you paid."

90.    Telling enrollment advisors that their pay would be cut or they would be terminated if they did not meet enrollment quotas is, quite obviously, a direct manner of linking compensation solely to incentive-based enrollment figures.

91.    Moreover, another Bridgepoint/Ashford manager, Josiah Goodin, told Mr. Ferguson that his inability to meet the minimum "average applications per week is a direct risk for the company."  The manager further stated that "anyone not meeting these numbers is a risk."

92.    Throughout his tenure at Ashford, Mr. Ferguson experienced immense pressure to retain students once they are enrolled, being admonished on multiple occasions to maintain a "minimum 70-75% retention rate." Bridgepoint/Ashford managers often pressured him and other enrollment advisors to misleadingly reassure enrolled students about the quality and value of their education throughout their enrollment period, particularly if a student considered withdrawing after discovering previously undisclosed administrative fees or deficiencies in the academic programs in which they were enrolled.

93.     Bridgepoint also pressures enrollment advisors to mislead prospective students regarding how much of their degree program will be covered by federal financial assistance.

94.     For example, on November 16, 2010, Mr. Ferguson explained that Quance sought to enroll a student who expressed reluctance because of the length of time it would take to graduate.  Quance suggested that the student enroll and take twice the course load to graduate in half the time.  But Quance failed to disclose that only half of these classes could be paid for through federal financial aid and the student would have to pay the rest out of pocket, even though Quance knew the student could not afford to do so.  By this misrepresentation, Quance successfully induced the prospective student to enroll.

95.     In another instance on September 21, 2010, Mr. Ferguson was pressured to enroll a student, even though the student stated that she was not ready to start in one week.  Quance instructed Mr. Ferguson that, "We overcome her objection and get her into school even if she is not grant eligible," and that, "if she does not get the grant money, tell her that she can skip two classes at the end of the year to negate the shortfall when her next loan period begins."

96.     On October 12, 2010, Piatek pressured Mr. Ferguson to enroll a student who was clearly not ready to make a decision to return to school.  Piatek insisted that "now is not the time to let students go" and reminded Mr. Ferguson that he had "numbers to hit."  Under pressure, Mr. Ferguson enrolled the student, who cancelled her enrollment only days later.

97.     These specific instances in which Bridgepoint pressured Mr. Ferguson to enroll and retain students for the sole purpose of collecting financial aid from the government are examples of a large, sophisticated business practice predicated on receiving maximum federal student loan dollars from the government by deceiving students into enrolling for classes for which they cannot afford.  For example, Mr. Ferguson was given lists of "leads" of

False Claims Act Complaint
*(United States ex rel. Ferguson & Pacheco v. Bridgepoint Educ. Inc. et al.)*

prospective students to call and enroll that were purchased by Bridgepoint from third party employment sites such as monster.com. The intent was two-fold: (1) to identify people who were unemployed or unhappy in their current jobs and who might want to consider going back to school; and (2) to identify people who likely had little or no income and who would require federal financial aid to pay for school.

98.   In addition, Mr. Ferguson was pressured repeatedly to attempt to enroll students in the most expensive programs at Ashford, the cost for which were deliberately set to match exactly the maximum annual federal student loan allowance. For example, the first year of attendance at Ashford cost $9,500, the exact maximum amount of federal student loans for which a first year student at Ashford could qualify. Likewise, the tuition rate for the second year of attendance at Ashford ($10,500) and for the third and fourth years at Ashford (each $12,500) mirrored exactly the maximum allowable amount of federal student aid for which an Ashford student could apply. By deliberately setting the rates in this way, Bridgepoint ensured that it could receive the maximum amount of student loan money available from the government for each student enrolled.

### (2)   Mr. Pacheco's Experience

99.   Mr. Pacheco was one of Bridgepoint's best-performing enrollment advisors. During his time working for Ashford, Mr. Pacheco was often the highest producer on his team and floor, and even ranked within the top-100 of enrollment advisors companywide for the number of students he enrolled. Despite his success with the Company, Bridgepoint and Ashford constantly pressured Mr. Pacheco to maintain and to even increase his enrollment numbers.

100.   Mr. Pacheco's enrollment advisor reviews were performed according to a quantitative (about 75%) and qualitative (about 25%) points system based entirely on the number of students enrolled and retained. This points system is completely based on an enrollment advisor's numbers, for which

points are awarded in three categories: (1) "applications to enrollment," "applications to complete," and "applications to start." Such reviews are performed every six months, and the Company rewards enrollment advisors who receive high scores with raises and promotions.

101. Those enrollment advisors who score the best under this matrix, which is based entirely on enrollment and retention numbers, are rewarded with perks. Several of the perks Ashford provides the best scoring enrollment advisors come in the form of competitive advantages, such as extra "leads" for prospective students, access to the school's "Live Chat" and "Live Transfer" utilities, and placement on the "Hunt Team." Enrollment advisors who reached high numbers also received lifestyle perks, such as increased break times or less monitoring. Teams of enrollment advisors who collectively win various competitions, such as the most applications obtained in a given day, receive prizes such as catered lunches or team excursions. High-scoring enrollment advisors also become eligible for tuition reimbursement from the school, for both themselves and for immediate family members.

102. Regardless of how high their scores are or how many students they enroll, Ashford automatically places those enrollment advisors who score lowest relative to their peers in a probationary program called the "PACQ." Enrollment advisors placed in the PACQ are closely monitored and forced to adhere to a remedial script called the "PACQ sheet."

103. Even though he was one of Ashford's top performing enrollment advisors, the school ratcheted up the pressure to perform on Mr. Pacheco by delaying the performance reviews that would have determined his eligibility for promotions and raises. When Ashford did perform reviews of Mr. Pacheco, those reviews pertained exclusively to his numbers: enrollment and retentions. The exclusive focus Ashford and his managers placed on his enrollment numbers

False Claims Act Complaint
(United States ex rel. Ferguson & Pacheco v. Bridgepoint Educ. Inc. et al.)

predictably and inevitably pressured Mr. Pacheco to likewise focus on increasing those numbers by whatever means necessary.

104.   Ashford taught Mr. Pacheco a variety of means to increase his numbers during his training and tenure as an enrollment advisor:

- The school trained Mr. Pacheco to mislead students as to the length of its degree programs and, consequently, the true cost of attending Ashford. Ashford trained Mr. Pacheco and his peers to base the tuition figures they quote on students' taking eight courses per year, which would normally require five years of attendance to complete, while simultaneously telling students that they can comfortably complete their degrees in four years, which would require taking ten courses at a time. In so doing, Ashford misleads students into enrolling under the mistaken belief that they can pay for their degrees with four years' worth of student loans when, in reality, they actually will require five years' worth.

- Because the school was eager to obtain as much Title IV money as quickly as possible, it also trained Mr. Pacheco and his peers not to tell students that they are entitled to take breaks of up to 29-days in between their courses without the risk of being dropped by the school. Instead, Ashford trained enrollment advisors to encourage students to "double up" on their course loads in order to complete their schooling more quickly, without also explaining to those students that, by doing so, they would exhaust their annual financial aid allotments and be required to pay out of pocket.

- Instead of informing students of the risks and obligations imposed by federal student loans, Ashford instructed Mr. Pacheco and his peers to tell students that as long as they were at least 18 years old, had never defaulted on a loan, and had a high school diploma, they had nothing to worry about in financing their Ashford educations.

- While Ashford instructed Mr. Pacheco and his peers to hype the virtues of the school's physical campus in Iowa, it also

-30-

instructed them not to disclose to prospective students that only 1% of its students actually attend the university in-person.

- Ashford also instilled in Mr. Pacheco and his peers the importance of using vague but misleading terminology when making assurances and promises to students about their post-graduation job prospects. For example, enrollment advisors were taught to make representations such as, "You could make $200,000 working as a CPA in just two years," without disclosing that very few, if any, of the school's graduates actually earn this amount.

105. Ashford was especially specific about the instruction Mr. Pacheco was to give prospective students with respect to financial aid:

- Ashford strictly forbid Mr. Pacheco from explaining to students that they were entitled to submit financial aid paperwork themselves, so as to have their financial aid disbursed directly to themselves, rather than to allow Ashford to submit their financial aid paperwork and receive their disbursements. By submitting financial aid paperwork on behalf of students, Ashford guaranteed its own income stream and placed students at the school's mercy with respect to aid disbursements.

- Through the course of his employment, Mr. Pacheco learned that Ashford waits for five to six weeks to submit students' financial aid paperwork. It does this in order to keep its default rates low, as the school simply drops students who miss class within the first five weeks without ever submitting their financial aid paperwork. Ashford simply never submits the Title IV paperwork for such students, who are nonetheless entitled to financial aid and who relied on Ashford's promises regarding financial aid in their decisions to attend the school. Ashford then bills such students directly and, if they do not pay the bill out of pocket, refers these students out for collection. The school, of course, strictly forbid Mr. Pacheco

-31-

and his peers from explaining to students that, if they were dropped from their programs within the first five weeks of school, they would receive no financial aid and be required to pay out of pocket.

- Ashford encouraged Mr. Pacheco and his peers to entice prospective students with the promise that they could receive some pocket money if their financial aid awards exceeded the cost of their schooling. In an effort to entice students, enrollment advisors were encouraged to explain to students that they could receive up to $3,000 in loan disbursements if their financial aid allowance exceeded the cost of their tuition and fees. It simultaneously forbid Mr. Pacheco and his peers from explaining to students that such disbursements were the product of federal loans that are not dischargeable through bankruptcy and that, by virtue of Ashford submitting the relevant paperwork, could not be deferred.

106.   To ensure that enrollment advisors did not deviate from their scripts or impermissibly disclose the truth of the school's financial aid policies to prospective students, Ashford monitored the calls of Mr. Pacheco and his fellow enrollment advisors. The only time Mr. Pacheco was ever criticized for his qualitative performance as an enrollment advisor, in fact, came when he attempted to explain the Ashford's financial aid policies to a prospective student.

107.   During his employment, Mr. Pacheco observed that his manager was enrolling students at Ashford who had expressly indicated they were not interested in the school. After Mr. Pacheco complained about this practice, he observed that the enrollment records of such students disappeared from the school's computer system, even though the records for students who un-enrolled ordinarily did not.

## VI.   DEFENDANTS' VIOLATIONS OF THE FCA

108.   The foregoing allegations establish each of the essential elements of FCA liability:  (a) a false statement or fraudulent course of conduct; (b) made

-32-

with scienter; (c) that was material; and (d) which caused the United States to pay out money.

### A.   Falsity

109.   As demonstrated above, Defendants implement illegal recruitment tactics designed to enroll the maximum number of students and to receive the maximum amount of federal funding under Title IV.

110.   One of these illegal tactics is compensating enrollment advisors *solely* based on the number of students they enroll.

111.   During the Relevant Period, Bridgepoint, Ashford, and The Rockies made thousands of decisions to increase or decrease the compensation of their enrollment advisors.  Each decision violated Title IV and its attendant regulations.  Bridgepoint, Ashford, and The Rockies committed these violations knowingly with the specific intent to deceive the DOE.

112.   Bridgepoint, Ashford, and The Rockies designed the matrix evaluation system and prepared, by themselves and through their consultants, other false reports relating to enrollment advisor compensation.  Bridgepoint, Ashford, and The Rockies knowingly submitted these reports to the DOE and other agencies of the United States to create a false appearance of compliance with Title IV.  Defendants never had any intention of actually using the matrix system to evaluate the compensation of its enrollment advisors, and in fact never did use it to evaluate the compensation of its enrollment advisors during the Relevant Period.  Instead, Defendants compensated and continue to compensate their enrollment advisors solely based on the number of students they enroll.

113.   In June 2005 and September 2007, Bridgepoint, Ashford, and/or The Rockies submitted false certifications and promises to the DOE to obtain PPAs regarding their compliance with Title IV and its attendant regulations.

114.   During the Relevant Period, Bridgepoint, Ashford, and/or The Rockies filed with the DOE certifications and reports affirming their compliance with Title IV and its attendant regulations.

115.   All of the foregoing reports, certifications, and promises are false.

**B.    Scienter**

116.   At the time Defendants violated the FCA by committing promissory fraud, as alleged above, they knew they had no intent to honor the terms of the PPAs.  Thus, Defendants acted with scienter and intentionally lied to and deceived the United States

117.   In addition, at the time Defendants violated the FCA by making false certifications, as alleged above, Defendants knew or recklessly disregarded the fact that their certifications to the DOE and other agencies and representatives of the United States were false.  Thus, Defendants acted with scienter.

118.   Moreover, because Bridgepoint, Ashford, and The Rockies designed and implemented the illegal and fraudulent recruitment tactics, they knew that the use of these tactics would lead, and indeed led, to low job placement rates, high loan default rates, and other adverse information constituting violations of Title IV.

119.   Bridgepoint, through the acquisitions and conversions of Ashford and The Rockies, was put on notice of Ashford's and The Rockies' eligibility and certification approval report, their refund policy, any required default management plan, program reviews, audited financial statements, and compliance audits.  Thus, Bridgepoint's management was fully aware, during the Relevant Period, whether Ashford and The Rockies complied with Title IV.

120.   Moreover, Bridgepoint's management was on notice that Bridgepoint, Ashford, and The Rockies were required to refrain from engaging in the unlawful conduct alleged in this complaint.  Specifically, 20 U.S.C. § 1094

and 34 C.F.R. § 668.14(b)(22)(i) provide the condition under which Bridgepoint, Ashford, and The Rockies were required to operate in order to remain eligible for federal student aid funding.  Ashford and The Rockies were required to enter into PPAs with the DOE.

121.   The PPAs conditioned Ashford's and The Rockies' initial and continuing eligibility to participate in Title IV programs upon compliance with multiple, specific requirements, including: (a) funds received from the DOE are required to be used for the purpose specified in the program; (b) administrative and fiscal procedures were required to ensure proper and efficient administration of funds received from the DOE; (c) job placement rates, graduation statistics, and other information necessary to substantiate the truthfulness of the recruiting advertisements were required to be available to prospective students at or before the time of application; (d) a default management plan for approval by the Secretary of the DOE was required when the Cohort Default Rate was in excess of 10% for two years; (e) 20 U.S.C. § 1091b provides the refund policy; and (f) any commission, bonus, and other incentive payment based on success in securing enrollments or financial aid is prohibited under 20 U.S.C. § 1094(a)(20).

122.   Bridgepoint's management knew that Bridgepoint, Ashford, and The Rockies violated some or all of the foregoing requirements.

123.   Bridgepoint's management was further put on notice of Bridgepoint's violations of Title IV by the investigation reports of the Government Accountability Office, the Office of Inspector General, and the United States Senate.

124.   Accordingly, Bridgepoint was fully aware of the high default rates, low job placement rates, and other adverse information constituting violations of Title IV and its attendant regulations.

///

### C.   Materiality

125.   The foregoing false statements, certifications, and promises made by Bridgepoint, Ashford, and The Rockies are material to DOE's determination of their eligibility in entering into and continuously participating in Title IV programs.

126.   The eligibility of Bridgepoint, Ashford, and The Rockies is explicitly conditioned upon their compliance with Title IV and its attendant regulations.  These requirements are set forth not only in the statutes and regulations, but also in Ashford's and The Rockies' PPAs.

127.   Specifically, compliance with the prohibition against incentive compensation is a necessary condition of continued eligibility and participation.

128.   Bridgepoint, Ashford, and The Rockies, however, knowingly disregarded these explicit conditions of compliance.

### D.   Claim for Payment

129.   Despite their knowledge of non-compliance with Title IV, Bridgepoint, Ashford, and/or The Rockies presented false claims to the DOE, private lenders for federal student loans, and other agencies and representatives of the United States for payment of funds under Title IV programs.

130.   Throughout the Relevant Period, Bridgepoint has derived the bulk of its multi-million-dollar revenues from financial aid received through its students under Title IV programs administered by the DOE under the HEA.

131.   While Relators were employed at Ashford, and before and after their times of employment, Bridgepoint, Ashford, and The Rockies presented claims to the DOE for Title IV money based on Title IV eligibility obtained by fraud and by fraudulent non-compliance with Ashford's and The Rockies' PPAs with the DOE.  These false claims were a necessary part of Bridgepoint's growth plan, and were directed, supported, and implemented by Bridgepoint's management.

False Claims Act Complaint
*(United States ex rel. Ferguson & Pacheco v. Bridgepoint Educ. Inc. et al.)*

132.   Accordingly, all claims made by Bridgepoint, Ashford, and/or The Rockies to the agencies and representatives of the United States for payment under Title IV are false claims in violation of the FCA.

### Knowing False Statement to Get a False or Fraudulent Claim Paid or Approved, Violation of 31 U.S.C. § 3729(a)(1)
### (First Claim)

133.   Relators reallege and fully incorporate all of the preceding paragraphs.

134.   This is a claim for treble damages and penalties under 31 U.S.C. § 3729(a)(1).

135.   In performing the acts set forth in this complaint, Defendants defrauded the United States by knowingly presenting or causing to be presented to one or more officers of the United States false and fraudulent claims for payment or approval in contravention of the FCA, 31 U.S.C. § 3729(a)(1), to the damage of the treasury of the United States by causing it to pay out money it was not obligated to pay.

136.   Relators estimate that, as a proximate result of Defendants' wrongful conduct, the United States sustained damages exceeding millions of dollars every year during the Relevant Period.

### Knowing False Records or Statement to Get a False or Fraudulent Claim Paid or Approved, Violation of 31 U.S.C. § 3729(a)(2)
### (Second Claim)

137.   Relators reallege and fully incorporate all of the preceding paragraphs.

138.   This is a claim for treble damages and penalties under 31 U.S.C. § 3729(a)(2).

139.   By virtue of acts described above, Defendants have knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States in contravention

-37-

of 31 U.S.C. § 3729(a)(2), to the damage of the treasury of the United States, by causing the United States to pay out money it was not obligated to pay.

140.   As a proximate result of Defendants' conduct, as described in this complaint, the United States sustained damages in an amount according to proof at trial.

## Violation of California Business & Professions Code § 17200
## (Third Claim)

141.   Relators reallege and fully incorporate all of the preceding paragraphs.

142.   California Unfair Competition Law defines unfair competition to include any "unfair," "unlawful," or "fraudulent" business act or practice. CAL. BUS. & PROF. CODE § 17200 *et seq.* Unfair competition also includes "unfair, deceptive, untrue or misleading advertising." *Id.* § 17500. The statute also provides for injunctive relief and restitution for violations. *Id.* § 17203.

143.   This cause of action is brought on behalf of Relators, members of the general public, and the United States pursuant to California Business & Professions Code § 17200 *et seq.* Under § 17200, Relators are entitled to enjoin Defendants' wrongful practices and to obtain restitution of the monies paid to Defendants by reason of Defendants' unlawful, unfair, and/or deceptive acts and practices.

144.   As a direct and proximate result of the acts and practices alleged above, Relators, the general public, and the United States have been injured. This Court is empowered to, and should, order restitution to all persons from whom Defendants unfairly and/or unlawfully injured.

145.   Defendants' unlawful, unfair, and fraudulent business acts and practices, as described above, present a continuing threat to the general public and the United States, in that Defendants are continuing, and will continue, unless enjoined, to commit violations of § 17200. This Court is empowered to,

and should, grant preliminary and permanent injunctive relief against such acts and practices.

146.   Defendants further violated § 17200 *et seq.* because they violated numerous provisions of the California Private Postsecondary Education Act of 2009.  Under this statute, private postsecondary institutions may not:

(a)   Promise or guarantee employment, or otherwise overstate the availability of jobs upon graduation (§ 94897(b));

(b)   Advertise concerning job availability, degree of skill, or length of time required to learn a trade or skill unless the information is accurate and not misleading (§ 94897(c));

(c)   Pay any consideration to a person to induce that person to sign an enrollment agreement for an educational program (§ 94897(h));

(d)   Compensate an employee involved in recruitment, enrollment, admissions, student attendance, or sales of educational materials to students on the basis of a commission, commission draw, bonus, quota, or other similar method related to the recruitment, enrollment, admissions, student attendance, or sales of educational materials to students (§ 94897(n)); or

(e)   Require a prospective student to provide personal contact information in order to obtain, from the institution's Internet Web site, educational program information that is required to be contained in the school catalog or any information required pursuant to the consumer information requirements of Title IV of the federal Higher Education Act of 1965, and any amendments thereto (§ 94897(o)).

147.   Defendants violated each of these provisions by virtue of their deceptive, misleading, and unfair business practices alleged above herein.

148.   Defendants' unlawful and unfair business acts and practices, as described above, present a continuing threat to the general public and the Untied

-39-

States, in that, unless enjoined, Defendants are continuing, and will continue to commit violations of § 17200. This Court is empowered to, and should, order restitution as well as preliminary and permanent injunctive relief against Defendants' acts and practices.

## JURY DEMAND

149. Relators demand a trial by jury on all triable issues.

## PRAYER FOR RELIEF

Relators, on behalf of the United States, pray for judgment against Defendants on all claim as follows:

(a) judgment in favor of the United States against Defendants, because of their violations of the False Claims Act, in an amount equal to three times the amount of damages the United States has sustained by way of Defendants' violations of the False Claims Act, plus a civil penalty of not less than $5,000 and not more than $10,000 for each violation;

(b) an award to Relators, as *qui tam* relators, in the maximum amount allowed under the False Claims Act, 31 U.S.C. § 3730(d);

(c) punitive damages against Defendants;

(d) a declaration and judgment in favor of Relators and the United States against Defendants, by reason of the violations of California Business & Professions Code § 17200 *et seq.*;

(e) an order enjoining, preliminarily and permanently, Defendants from containing the unlawful conduct alleged above;

(f) an order compelling Defendants to disgorge all proceeds obtained as a result of their unlawful conduct alleged above;

(g) the costs of this suit, including expert fees, reasonable attorneys' fees, costs, and all reasonable expenses incurred in the prosecution of this action, as provided by law; and

False Claims Act Complaint
(United States ex rel. Ferguson & Pacheco v. Bridgepoint Educ. Inc. et al.)

(h)     such other and further relief as the nature of this case may require, or as this Court deems just, equitable, and proper.

DATED:   March 10, 2011

Johnson Bottini, LLP

*[signature]*

Francis A. Bottini, Esq.
Shawn E. Fields, Esq.


Chapin Fitzgerald Sullivan LLP

*[signature]*

Edward D. Chapin, Esq.
Douglas J. Brown, Esq.

*Attorneys for Plaintiffs-Relators*

-41-
False Claims Act Complaint
*(United States ex rel. Ferguson & Pacheco v. Bridgepoint, Educ., Inc. et al.)*

JS 44 Reverse (Rev. 12/07)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.     (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.     Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.     Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.     Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.     Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.     Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**     Example:     U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VII.     Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.     Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

```
Court Name: USDC California Southern
Division: 3
Receipt Number: CAS023881
Cashier ID: nsiefken
Transaction Date: 03/10/2011
Payer Name: johnson botinni llp
----------------------------------
CIVIL FILING FEE
 For: johnson botinni llp
 Case/Party: D-CAS-3-11-CV-000493-001
 Amount:      $350.00
----------------------------------
CHECK
 Check/Money Order Num: 6816
 Amt Tendered:  $350.00
----------------------------------
Total Due:      $350.00
Total Tendered: $350.00
Change Amt:     $0.00


There will be a fee of $45.00
charged for any returned check.
```

**ORIGINAL**

JS 44 (Rev. 12/07)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

### I. (a) PLAINTIFFS
United States of America ex rel. Ryan Ferguson and Mark T. Pacheco, as relators under the False Claims Act

### DEFENDANTS
Bridgepoint Education, Inc.; Ashford University; University of the Rockies; and Does 1 through 20

**(b)** County of Residence of First Listed Plaintiff   San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Johnson Bottini, LLP, Francis A. Bottini, Jr., 501 W. Broadway, Ste. 1720, San Diego, CA 92101 (619) 230-0063

Attorneys (If Known)   '11 CV0493   BTM MMA POR

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☒ 1   U.S. Government Plaintiff
- ☐ 2   U.S. Government Defendant
- ☐ 3   Federal Question (U.S. Government Not a Party)
- ☐ 4   Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | **PERSONAL INJURY** | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | |
| **REAL PROPERTY** | ☐ 362 Personal Injury - Med. Malpractice | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☒ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☐ 365 Personal Injury - Product Liability | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 230 Rent Lease & Ejectment | **PERSONAL PROPERTY** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 240 Torts to Land | ☐ 370 Other Fraud | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 245 Tort Product Liability | ☐ 371 Truth in Lending | | | ☐ 895 Freedom of Information Act |
| ☐ 290 All Other Real Property | ☐ 380 Other Personal Property Damage | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| **CIVIL RIGHTS** | ☐ 385 Property Damage Product Liability | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 441 Voting | **PRISONER PETITIONS** | ☐ 462 Naturalization Application | | |
| ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | ☐ 463 Habeas Corpus - Alien Detainee | | |
| ☐ 443 Housing/ Accommodations | **Habeas Corpus:** | ☐ 465 Other Immigration Actions | | |
| ☐ 444 Welfare | ☐ 530 General | | | |
| ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | | | |
| ☐ 446 Amer. w/Disabilities - Other | ☐ 540 Mandamus & Other | | | |
| ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | | | |
| | ☐ 555 Prison Condition | | | |

### V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

### VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
31 U.S.C. §3729
Brief description of cause:
Knowing false statements and records made to the United States for payment.

### VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $   Proof

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

### VIII. RELATED CASE(S) IF ANY
(See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE
03/10/2011

SIGNATURE OF ATTORNEY OF RECORD
_Frances A. Bottini_

FOR OFFICE USE ONLY

RECEIPT #  23881   AMOUNT  $ 350.00   03.10.11   APPLYING IFP  NJ   JUDGE _____   MAG. JUDGE _____